WALTER UPRIGHT, Appellant, *v.* MERCURY BUSINESS MACHINES Co., INC., Respondent.

First Department, April 11, 1961.

*David W. Kahn* for appellant.

*Kenneth Simon* of counsel (*Taylor, Scoll & Simon,* attorneys), for respondent.

BREITEL, J. P. Plaintiff, an individual, sues as the assignee of a trade acceptance drawn on and accepted by defendant in payment for business typewriters sold and delivered[*] to it by a foreign corporation. The trade acceptance is in the amount of $27,307.45 and was assigned to plaintiff after dishonor by defendant.

Involved on this appeal is only the legal sufficiency of the first affirmative defense. It alleges that the foreign corporation is the creature of the East German Government, a government not recognized by the United States. It alleges, moreover, that such corporation is an enterprise controlled by and that it is an arm and instrument of such government.

---

[*] It was stated in the argument, without contradiction, that the merchandise was shipped openly and passed regularly through United States Customs.

On motion addressed to its sufficiency Special Term sustained the defense. For the reasons that follow the defense should have been stricken as legally insufficient pursuant to subdivision 6 of rule 109 of the Rules of Civil Practice.

A foreign government, although not recognized by the political arm of the United States Government, may nevertheless have *de facto* existence which is juridically cognizable. The acts of such a *de facto* government may affect private rights and obligations arising either as a result of activity in, or with persons or corporations within, the territory controlled by such *de facto* government. This is traditional law (*Russian Reinsurance Co.* v. *Stoddard*, 240 N. Y. 149; *Salimoff & Co.* v. *Standard Oil Co.*, 262 N. Y. 220; *Texas* v. *White*, 74 U. S. 700, 733, overruled in part *Morgan* v. *United States*, 113 U. S. 476, 496; cf. *United States* v. *Rice*, 4 Wheat. [17 U. S.] 246, involving the effect of enemy occupation of United States territory; 1 Hyde, International Law [2d rev. ed., 1945], pp. 195–197; 48 C. J. S., International Law, § 5, pp. 8–10).

In the *Russian Reinsurance Co.* case, LEHMAN, J., later Chief Judge, summarized the principles (p. 158): " The fall of one governmental establishment and the substitution of another governmental establishment which actually governs; which is able to enforce its claims by military force and is obeyed by the people over whom it rules, must profoundly affect all the acts and duties, all the relations of those who live within the territory over which the new establishment exercises rule. Its rule may be without lawful foundation; but lawful or unlawful, its existence is a fact and that fact cannot be destroyed by juridical concepts. The State Department determines whether it will recognize its existence as lawful, and until the State Department has recognized the new establishment, the court may not pass upon its legitimacy or ascribe to its decrees all the effect which inheres in the laws or orders of a sovereign. The State Department determines only that question. It cannot determine how far the private rights and obligations of individuals are affected by acts of a body not sovereign or with which our government will have no dealings. That question does not concern our foreign relations. It is not a political question, but a judicial question. The courts in considering that question assume as a premise that until recognition these acts are not in full sense law. Their conclusion must depend upon whether these have nevertheless had such an actual effect that they may not be disregarded. In such case we deal with result rather than cause. We do not pass upon what such an unrecognized governmental authority may do, or upon the right or wrong of what

it has done; we consider the effect upon others of that which has been done, primarily from the point of view of fact rather than of theory."

So, too, only limited effect is given to the fact that the political arm has not recognized a foreign government. Realistically, the courts apprehend that political nonrecognition may serve only narrow purposes. While the judicial arm obligates itself to follow the suggestions of the political arm in effecting such narrow purposes, nevertheless, it will not exaggerate or compound the consequences required by such narrow purposes in construing rights and obligations affected by the acts of unrecognized governments (*Sokoloff* v. *National City Bank of N. Y.*, 239 N. Y. 158; *Salimoff & Co.* v. *Standard Oil Co., supra*). Thus, in *Sokoloff* v. *National City Bank of N. Y.*, CARDOZO, J., later Chief Judge, said (p. 165): "Juridically, a government that is unrecognized may be viewed as no government at all, if the power withholding recognition chooses thus to view it. In practice, however, since juridical conceptions are seldom, if ever, carried to the limit of their logic, the equivalence is not absolute, but is subject to self-imposed limitations of common sense and fairness."

The principles last discussed are the same as those presented by so authoritative a compiler as Hackworth as governing the effect of nonrecognition (1 Hackworth, Digest of International Law, p. 364 *et seq.*).

Applying these principles, it is insufficient for defendant merely to allege the nonrecognition of the East German Government and that plaintiff's assignor was organized by and is an arm and instrumentality of such unrecognized East German Government. The lack of jural status for such government or its creature corporation is not determinative of whether transactions with it will be denied enforcement in American courts, so long as the government is not the suitor.* (Actually, on the present pleadings no issue is raised that plaintiff assignee is that government, or is an arm of that government, or that the assignment to him of the trade acceptance is invalid or does not represent a genuine transfer.)

The extent to which courts will recognize the legal effect of transactions within the territory of an unrecognized government, even where the transaction is materially affected by the action of such government, has been dramatically demonstrated. In *Salimoff & Co.* v. *Standard Oil Co.* (262 N. Y. 220, *supra*) it

---

* For, if the unrecognized government were allowed to sue, this would be deemed recognition of jural status (*Russian Republic* v. *Cibrario*, 235 N. Y. 255). Note that the corporation perhaps could sue (see *United States* v. *Insurance Cos.*, 89 U. S. 99, *infra*).

was held that one who took property by purchase from the unrecognized Russian government which had confiscated such property from its rightful owners nevertheless had good title as against the onetime lawful owners.

Indeed, in the *Salimoff* case it was said (p. 227) : '' Such conduct [confiscation of property] may lead to governmental refusal to recognize Russia as a country with which the United States may have diplomatic dealings. The confiscation is none the less effective. The government may be objectionable in a political sense. It is not unrecognizable as a real governmental power which can give title to property within its limits.''

Consequently, *Luther* v. *Sagor & Co.* ([1921] 1 K. B. 456, revd. on other grounds 3 K. B. 532), cited by defendant, was not viewed as authoritative (to the same effect, see, *Banque de France* v. *Equitable Trust Co.,* 33 F. 2d 202; cf. *Sokoloff* v. *National City Bank of N. Y.,* 239 N. Y. 158, 164, *supra*). On the contrary, in both the *Salimoff* and *Banque de France* cases it was held that confiscatory decrees of an unrecognized Russian government might, in proper circumstances, be deemed valid and effective in altering private rights. A fortiori, the internal acts of the East German Government, insofar as they concern the parties here, should be given effect generally. At least, this is so in the absence of allegation that defendant's property was expropriated by wrongful governmental force, or that for other reasons the transaction in suit or that directly underlying it violates public or national policy.

This case does not involve the issues, tendered by defendant in its argument, of jural status of the East German corporation, or of its incapacity to transfer title, or even of its capacity to sue in our courts. These have been long recognized as issues to be resolved by reference to the actual facts — the realities of life — occurring in the territory controlled by a *de facto* government, unless, of course, the contemplated juridical consequences of such '' facts '' can be properly related as inimical to the aims and purposes of our public or national policy (*Russian Reinsurance Co.* v. *Stoddard, supra*; *Petrogradsky M. K. Bank* v. *National City Bank of N. Y.,* 253 N. Y. 23; *Moscow Fire Ins. Co.* v. *Bank of New York & Trust Co.,* 280 N. Y. 286, affd. by equally divided court 309 U. S. 624, overruled in *United States* v. *Pink,* 315 U. S. 203; *Thorington* v. *Smith,* 75 U. S. 1). Even the power of a rebel government in one of the Confederate States to create a corporation with capacity to sue the United States Government was admitted where such creation was not directly in furtherance of the rebellion (*United States* v. *Insurance Cos.,* 89 U. S. 99).

It is a false notion, if it prevail anywhere, that an unrecognized government is always an evil thing and all that occurs within its governmental purview are always evil works. There are many things which may occur within the purview of an unrecognized government which are not evil and which will be given customary legal significance in the courts of nations which do not recognize the prevailing *de facto* government. In a time in which governments with established control over territories may be denied recognition for many reasons, it does not mean that the denizens of such territories or the corporate creatures of such powers do not have the juridical capacity to trade, transfer title, or collect the price for the merchandise they sell to outsiders, even in the courts of nonrecognizing nations (cf. *Sokoloff* v. *National City Bank of N. Y.,* 239 N. Y. 158, 165–166, *supra*).

Of course, nonrecognition is a material fact but only a preliminary one. The proper conclusion will depend upon factors in addition to that of nonrecognition. Such is still the case even though an entity involved in the transaction be an arm or instrumentality of the unrecognized government. Thus, in order to exculpate defendant from payment for the merchandise it has received, it would have to allege and prove that the sale upon which the trade acceptance was based, or that the negotiation of the trade acceptance itself, was in violation of public or national policy. Such a defense would constitute one in the nature of illegality and if established would, or at least might, render all that ensued from the infected transaction void and unenforcible. Defendant buyer cannot escape liability merely by alleging and proving that it dealt with a corporation created by and functioning as the arm of and instrumentality of an unrecognized government.

Put more concretely: The public policy which denies juridical recognition to the East German Government is determined by the refusal of the political arm to recognize it. That means the East German Government cannot sue in our courts. The question whether its corporate instrumentality can sue is not so clear. Perhaps it could sue. But another, not otherwise lacking in capacity to sue, may, by way of transfer or other mesne assignment, sue on the underlying transaction, unless such transaction itself or the assignment is shown to violate the national or public policy. In order for such transaction or the assignment to violate national or public policy, it must be shown either to violate our laws or some definite policy. If the national government does not administratively forbid, or if it facilitates, the purchase and delivery into this country of East German

typewriters, and no law forbids it, then defendant buyer will be hard put to show the " illegality " of the underlying transaction, or the assignment, and thereby avoid payment of the price for such merchandise."

Moreover, the status of the East German territory is that of territory, once belligerent, but now occupied by a wartime ally, the Soviet Union, with the consent of the other allies. Nonrecognition, in the past, of the East German Government simply meant that, pending a reunification plan and free secret elections, the State Department refused to recognize the displacement of the Soviet Union as the power responsible for the territory and for the conduct of affairs there.

All of this explains why defendant's pleading should be required to depend on a sound theory. The effect of nonrecognition, used by defendant as some sort of umbrella to protect it from liability is not the answer.

Accordingly, the order of Special Term should be reversed, on the law, and the motion to strike the first affirmative defense granted, with $20 costs to plaintiff-appellant, with leave, however, to defendant if it is so advised, to serve an amended answer within 20 days containing an affirmative defense asserting a violation of public policy with respect either to the underlying sale or the transfer of the trade acceptance in accordance with the views expressed in this opinion, or depending on any other theory not now passed upon.

STEUER, J. (concurring). I concur in the result. As pointed out in the learned majority opinion, an unrecognized government lacks the capacity to sue. So does a branch or arm of that government, whether it be a corporation or any other entity. Concededly also, there is an infinite variety of relationship between governments and their corporate creations. By a branch of the government is meant an entity that performs governmental functions acting in its particular sphere as the alter ego of the government. Whether a particular corporation falls into that classification is a political rather than a·juridical question, and the determination of the State Department on that question is conclusive.

As a matter of pleading, it is a sufficient allegation that the corporation in question, the plaintiff's assignor, is a branch of an unrecognized government. It is not necessary to plead that our State Department has found that allowing it access to the courts is inimical to our policy. Such would have to be the proof, but, at this moment, we are not concerned with the proof. So lacking the factor of the assignment, the pleading would be sufficient.

The assignment presents several questions which do not call for decision at this point. Conceivably, a naked assignment might leave the assignee in a different position from that he would occupy if the assignment were a transfer of a bona fide interest in the claim. A different public policy might determine the result and different legal principles might well ensue. The pleading ignores the assignment. To that extent it does not meet the issue tendered by the complaint, and the defense, to that extent, is insufficient.

RABIN, STEVENS and EAGER, JJ., concur with BREITEL, J. P.; STEUER, J., concurs in result in opinion.

Order entered on September 16, 1960, denying plaintiff's motion to strike out the first defense pleaded in the defendant's answer, reversed, on the law, with $20 costs and disbursements to the appellant, and the motion to strike the first affirmative defense granted, with $10 costs, with leave, however, to defendant if it is so advised, to serve an amended answer within 20 days after service of a copy of the order entered herein, with notice of entry, containing an affirmative defense asserting a violation of public policy with respect either to the underlying sale or the transfer of the trade acceptance in accordance with the views expressed in the opinion of this court filed herein, or depending on any other theory not now passed upon.